**In re Dennis CHIRA, Debtor.**

**No. 05–22074.**

United States Bankruptcy Court, S.D. Florida, Fort Lauderdale Division.

June 2, 2006.

Ivan J. Reich, Becker & Poliakoff, P.A., Fort Lauderdale, Florida, Kevin Markau, for Purchaser.

Joel Saal, for trustee.

### ORDER ON TRUSTEE'S MOTION TO ASSUME EXECUTORY CONTRACT FOR SALE OF REAL PROPERTY

JOHN K. OLSON, Bankruptcy Judge.

This matter came before the Court on Trustee Sonya Salkin's February 28, 2006 Motion to Assume Executory Contract for Sale of Real Property, and to Settle Dispute with José Saal ("365 Assumption Motion") (CP 113), supplemented by a Memorandum of Law filed March 30, 2006 (CP 133), and on the Trustee's Verified Motion for Retroactive Extension of Deadline to Assume or Reject Executory Contract (CP 124) filed March 17, 2006. On March 30, 2006, José Saal filed Purchaser, José Saal, as Trustee's Memorandum of Law in Support of Chapter 7 Trustee, Sonya Salkin's Motion to Assume Executory Contract for Sale of Real Property, and to Settle Dispute with José Saal, Dated February 28, 2006 ("Saal's Motion") (CP 130). On March 31, 2006, Sheldon Hotel Lounge Corp. and Elizabeth Chira filed Elizabeth Chira's and Sheldon's Opposition to Trustee's Motions (1) to Assume Saal Purchase Contract and for (2) Retroactive Extension of Time to Move to Assume Saal Purchase Contract ("Elizabeth's Motion") (CP 139). On March 31, 2006, Tiffany Walker filed Tiffany Lane Walker's Response to Trustee's Motion to Assume Purported Executory Contract and Settle Dispute ("Tiffany's Motion") (CP 132). All parties have fully briefed the issues and the Court is satisfied that it is appropriate to rule.

### Factual Background

Dennis Chira (the "Debtor") and his first former wife, Elizabeth Chira ("Elizabeth") (collectively the "Chiras"), are co-owners of real property located in Hollywood, Florida known as the Sheldon Beach Hotel (the "Hotel"). The Chiras purchased the Hotel in 1978.

The Chiras were divorced pursuant to a Final Judgment entered on June 17, 1999 (the "Divorce Judgment"). The Divorce Judgment provided that the Debtor and Elizabeth would continue to own the Hotel as joint owners. The Divorce Judgment incorporated a Post–Nuptial Agreement executed by the Debtor and Elizabeth on November 16, 1993 (the "Post–Nuptial Agreement"), and prohibited either party's unauthorized transfer or sale of any interest in the Hotel without the other party's or the Divorce Court's express consent.

Post–Divorce Judgment operation of the Hotel proved to be untenable. The Debtor and Elizabeth were unable to come to an agreement regarding the ownership, management and disposition of the Hotel resulting in extensive post-judgment litigation regarding those and related issues. As a result of the impasse between the Debtor and Elizabeth, on October 25, 2001, the Divorce Court entered an Order on a Renewed Motion for Appointment of Receiver (the "Receiver Order"), which appointed Dean Liotta as Receiver ("Receiver") over the Hotel and the corporation running the Hotel, the Sheldon Hotel Lounge Corp. ("Sheldon").

Notwithstanding the terms of the Divorce Judgment which prohibited transfers of interests in the Hotel by either the Debtor or Elizabeth, and notwithstanding the prior appointment of the Receiver, the Debtor transferred an interest in the Hotel to Nick Kahook or an entity controlled by him, Sheldon Beach Resorts, Inc. (collectively with Kahook, the "Kahook Entities"). On June 4, 2002, the Divorce Court entered an Order voiding the interest received by the Kahook Entities from the Debtor. This was appealed to the Fourth District Court of Appeal, which affirmed *per curiam* on July 2, 2003.

Notwithstanding the results of the transfer of part of his interest in the Hotel to the Kahook Entities, and in further apparent derogation of the provisions of the Divorce Judgment, the Debtor purported to convey half of his interest in the Hotel to his second wife (and soon-to-be second ex-wife) Tiffany Walker, by Quit Claim Deed[1] dated July 22, 2003 (the "Quit Claim Deed").

By no means asleep at the switch, the Receiver promptly filed an action on October 24, 2003, in the Divorce Court against Tiffany to set aside and invalidate any interest claimed by her in the Hotel. Tiffany was served with the Complaint on October 31, 2003 and because she failed to respond, on December 5, 2003, a Default Judgment (the "Default Judgment") was entered against her, invalidating her interest in the Hotel. Subsequent to the entry of the Default Judgment, Tiffany moved to vacate the Default Judgment. The Receiver and Tiffany's counsel then negotiated the terms of an Agreed Order, which was entered on January 12, 2004, setting aside the Default Judgment, in exchange for Tiffany's consent to, and cooperation with, any and all efforts of the Receiver to sell the Hotel (the "Agreed Order Vacating Default").[2]

On August 28, 2003, the Divorce Court ordered the Receiver to sell the Hotel for the benefit of the Debtor and Elizabeth (whom the Divorce Court apparently considered to be the owners of the Hotel, notwithstanding the Quit Claim Deed). The Receiver proceeded to market the Hotel, and on January 12, 2004, the Divorce Court entered an Order Granting Receiver's Motion for Authorization to Accept Purchase Offer and Sell Assets of Receivership Estate (the "Sales Acceptance Order", and together with the Sales Procedure Order, the "Sales Orders").

After the entry of the Sales Acceptance Order, the Receiver executed a Purchase

---

1. Whether an interest in property can be transferred under Florida law by quit claim deed, and whether the transfer to Tiffany could be effective in light of the provisions of the Divorce Judgment are issues which the Court does not have to reach in order to rule on the 365 Assumption Motion.

2. Whether Tiffany's subsequent actions are consistent with that agreement remains to be determined another day.

and Sales Agreement agreeing to convey the Hotel to José Saal (the "Purchaser"). Meanwhile, Elizabeth had appealed the Sales Procedure Order to the Fourth District Court of Appeal (the "Sales Procedures Order Appeal"). Elizabeth did not appeal the Sales Acceptance Order. The closing of the Purchase Agreement between Purchaser and the Receiver was stayed in Divorce Court pending the Appellate Court's ruling on the Sale Procedures Order Appeal. On November 24, 2004, the 4th DCA issued a *per curiam* affirmance of the Sales Procedure Order (the "Sales Affirmance").

On or about January 28, 2005, after the Sale Affirmance and after issuance of the mandate by the Appellate Court, the Debtor, Elizabeth and the Kahook Entities[3] entered into a joint Stipulation for Global Settlement Agreement (the "Global Settlement Agreement").[4] In a moment of rare consensus, on February 1, 2005, the Debtor and the Elizabeth moved in the Divorce Court for approval of the Global Settlement Agreement (the "Settlement Approval Motion"). At the same time, Elizabeth filed a Motion to Nullify, Vacate and Quash Order Granting Receiver's Motion for Authorization to Accept Purchase Offer and Sell Assets of Receivership Estate, to Nullify Contract for Sale and Purchase and for Other Relief directed to the Purchase Agreement (the "Motion to Vacate Sale").

On February 15, 2005, the Divorce Court held a hearing on the Settlement Approval Motion and approved it. Because there was now a deal on the table to which both the Debtor and Elizabeth had agreed, the Divorce Curt ordered the Re-

ceiver discharged effective March 1, 2005 (the "Receivership Discharge Order").

Given the prior history of the litigation involving the Hotel, the Purchaser was justifiably concerned that the discharge of the Receiver could adversely affect timely completion of the sale. Accordingly, on March 2, 2005, the Purchaser filed a Motion to Reinstate the Receiver for purpose of closing the sale of the Hotel. The Purchaser also sought to an order from the Divorce Court rejecting the lease between the Hotel and Sheldon.

On April 8, 2005, the Divorce Court held a hearing on the three pending motions concerning the sale of the Hotel to Purchaser: Elizabeth's Motion to Vacate Sale; the Purchaser's Motion to Reinstate the Receiver; and the Purchaser's Lease Rejection Motion. The Divorce Court denied all three motions at the hearing. It is clear from the transcripts of that hearing, and of the hearing held by the Divorce Court on February 15, 2005, that the Divorce Court intended that the Hotel be sold to the Purchaser. The Divorce Court discharged the Receiver because the Court believed that the contract between the Receiver and the Purchaser was valid and enforceable, and that it was not necessary for the Receiver to stay in office for the sale to be consummated. *See* Exh. K and O to Saal's Motion.

The Debtor's bankruptcy case was commenced less than a week later by creditors of the Debtor, who filed an involuntary Chapter 7 petition under 11 U.S.C. § 303 on April 14, 2005. Sonya Salkin (the "Trustee") was appointed interim Chapter

---

**3.** In light of the 2002 avoidance of the Debtor's transfer to the Kahook Entities by the Divorce Court, affirmed by the 4th DCA in 2003, it is unclear to this Court why or how the Kahook Entities had any remaining interest.

**4.** Where was Tiffany? Here again, the Court does not know, and does not need to know, in order to determine the 365 Assumption Motion.

7 trustee on June 13, 2005, and was appointed Chapter 7 trustee after an order for relief was entered in this case on June 20, 2005.

### Conclusions of law

#### A. Legal standard for approval of assumption of executory contract

As a preliminary matter, it is necessary to determine whether the contract between the Receiver and the Purchaser was "executory"—that is, whether obligations remained on both sides as of the date of the Order for Relief. Although this issue is difficult in some cases, it is perfectly clear here that the Purchase Agreement between the Receiver and the Purchaser was an executory contract because there were material obligations yet to be performed on both sides before the closing. *In re Wells,* 227 B.R. 553 (Bankr. M.D.Fla.1998). The Purchaser had to pay and the Receiver as seller had to deliver title.

A second preliminary question posed by a motion to assume an executory contract under § 365 is whether the trustee has provided adequate assurances that she will (a) promptly cure any default, (b) compensate the nondebtor party to the contract for any actual or pecuniary loss resulting from such default, and (c) perform the contract in the future. *See* 11 U.S.C. § 365(b)(1)(A)-(C). The Trustee has made a sufficient showing of her ability to perform and has satisfied this criterion.

Even if the trustee has provided this "adequate assurance," the court's approval is still not mandatory. To approve a trustee's assumption "require[s] a judicial finding up-front that it was in the best interests of the estate (and the unsecured creditors) for the debtor to assume the lease, pursuant to 11 U.S.C. § 365(a)." *In re Klein Sleep Products, Inc.* 78 F.3d 18, 25 (2d Cir.1996). "[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract [pursuant to 11 U.S.C. § 365] should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *In re Orion Pictures Corp.,* 4 F.3d 1095, 1099 (2d Cir.1993), cert. denied, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994).

The transcripts from the Divorce Court hearings on February 15, 2005 and April 8, 2005 make perfectly clear that the Divorce Court intended that the Hotel be sold. *See* Exh. K and O to Saal's Motion. The Sales Orders were approved on January 12, 2004. Elizabeth appealed the Sales Procedure Order[5] and on November 24, 2004 the 4th DCA affirmed the Sales Procedure Order. As a result of the affirmance of the Sales Procedure Order, the Trustee and Purchaser argue that the Purchase Agreement is a valid executory contract, and if the Trustee was not to assume it, there may be a significant claim against the bankruptcy estate for rejection damages.[6]

---

**5.** But not, as noted above, the Sale Acceptance Order. In the absence of such an appeal, query if Elizabeth is not bound by the terms of that Order under issue preclusion principles.

**6.** What is really going on in this case is that the Hotel is now worth millions of dollars more than the purchase price under the executory contract between the Purchaser and the

Receiver. Naturally enough, Elizabeth would like more for her half interest in the Hotel than is provided for under the Purchase Agreement. Meanwhile, the Purchaser has advised the Court that he owns or controls significant adjoining parcels and needs the Hotel site to complete a major development project on Hollywood beach—and that he would have substantial consequential damages if the contract were rejected.

The assumption of the Purchase Agreement would obviate any potential rejection claims that Purchaser may have against the bankruptcy estate if the Purchase Agreement were not to be assumed. Simply stated, the effect of rejecting the executory contract, followed by a sale of the Hotel under a higher and better offer, would be to increase the amount of unsecured claims by an amount equal to at least the difference between the sale price under the existing Purchase Agreement and any new contract. Because of the potential consequential damages discussed in the preceding footnote, it is probable that the Purchaser's damages would exceed the difference in the purchase prices, netting no benefit to the estate. Furthermore, as Saal's Motion states, "Purchaser has agreed to pay to the Trustee an additional $2,000,000 above and beyond the original price contained in the Purchase Agreement. The $2,000,000 premium is intended to benefit the Chapter 7 Estate."[7] (Saal's Motion ¶ 46). In the circumstances, this Court is satisfied that assumption of the executory Purchase Agreement would be beneficial to the bankruptcy estate.

**B. Disposition of the Hotel under the Purchase Agreement is consistent with the Divorce Court's intent and its power in receivership cases**

■ The Hotel was placed into receivership by the Divorce Court for the purpose of sale and "the power of a receiver to make [new] contracts largely depends whether he is a passive receiver, appointed merely to conserve the property or whether he is an active receiver appointed to run the business," *Wigton v. Climax Coal Co.*, 270 Pa. 420, 113 A. 425 (Pa.1921), citing 8 *Fletcher Cyc. Corp.* 8927. The receivership in this case was active; the Divorce Court instructed the Receiver to seek the sale of the Hotel while operating it. *See* Exh. K and O to Saal's Motion. Consequently, the Receiver had broader powers to enter into contracts than if he had been appointed solely to conserve the property.

After an agreement was reached between the Receiver and Purchaser to sell the Hotel, the Divorce Court heard and denied Elizabeth's motions attempting to vacate the sale. The Fourth District Court of Appeal affirmed the sale. The clear intent of the Divorce Court was that the Hotel be sold to the Purchaser under the Sales Purchase Order.[8] The Trustee cites *Wigton* for the premise that the termination of a receiver after the court's approval of a sale contract continued to bind the corporation to honor the contract once the business was returned to it by the receiver. Although the *Wigton* case is not directly on point in that the *Wigton* receiver was not charged with selling the assets in the receivership estate, it is instructive in determining whether the Purchase Agreement should be enforced.

---

7. Of course, Elizabeth has argued, and can be expected to argue in the future, that half of the $2 million additional payment should be hers. That issue too remains for another day.

8. At the February 15, 2005, hearing upon both the Settlement Approval Motion and the Motion to Vacate Sale, the Divorce Court approved the Global Settlement Agreement, and stated "because I'm accepting a global universal settlement agreement that gets rid of unnecessary receivers at this point. They're not necessary. Their purpose was to resolve conflict in operation [of the hotel] there is now not a conflict in operation." See Exh. K at p. 41. l. 13–18. Further, as to the issue of the closing of the Purchase Agreement, the court stated "Well, okay, I understand there is a little bit of frigidity about the fact that I was affirmed on appeal on the sale order and so forth but I am not sure that appellate opinion is contingent upon who the seller is." See Exh. K at p. 25, l. 8–12.

*Wigton* dealt with an active receivership where the receiver was placed in charge of a railroad. The receiver in *Wigton* was not instructed to sell the assets, as the Receiver here was, but was instead charged with the maintenance and operation of the railroad. As part of that exercise, the *Wigton* receiver entered into contracts on behalf of the railroad for the operation of the railroad including contracts that extended beyond the duration of the receivership.

■ Elizabeth cites *Madorsky v. Suburban Homes Co.*, 45 Ohio App. 83, 186 N.E. 371 (1933) for the proposition that generally a receiver cannot enter into contracts binding the estate in receivership to performance extending in time beyond the duration of the receivership. *Madorsky* 186 N.E. at 371–372. *Madorsky* does state the general rule with respect to receivership contracts. However, *Wigton* provides an exception to this general rule, concluding, "the court may authorize its receiver to make contracts which are usual and customary in the particular operation, although they extend beyond the term of the receivership." *Id.* 113 A. at 426, *citing Gay v. Hudson River E.P. Co.*, 173 F. 1003 (N.D.N.Y.1909). In our case, the Receiver was dismissed before the sale could be consummated but just as in *Wigton*, the receivership court approved the sale. Elizabeth should be bound by the contract, just as the corporation was in *Wigton*.

■ A receiver is an officer of the court and the court's power over disposition of the property does not automatically terminate with the dismissal of the receiver. As the court in *Miller, Franklin & Co. v. Gentry*, 230 Mo.App. 892, 79 S.W.2d 470 (Mo.App.1935) stated:

[T]he position of receiver is quite different. He is not as already said a trustee in the strict sense of the term, but is an officer of the court, and the estate in his charge is in custodia legis. He takes powers, not from a trust agreement, but from the orders of the court. He is but the arm or the hand of the court. He acts as the representative of the court and is subject to its orders. The court itself has custody of the estate; the receiver is but the court's creature. *Miller, Franklin & Co.*, 79 S.W.2d at 473.

The Divorce Court's power over the Hotel did not end with the discharge of the Receiver. "It may be stated as a general rule that upon termination of an action wherein a receiver has been appointed the court has continuing power to make disposition of the property which has come into the receiver's possession by virtue of his appointment." *Coley v. Superior Court of the City and County of San Francisco*, 89 Cal.App. 330, 334, 264 P. 1110 (1928).

■ Finally, Florida law is clear that a receiver is the custodian for the court, through which the court controls the receivership estate. *Murtha v. Steijskal*, 232 So.2d 53 (Fla. 4th DCA 1970) held:

The custody of property by the court through its receiver is the custody of the sovereign power or government acting through the courts, possession by the court of the res gives jurisdiction over the res to the court appointing the receiver and gives such court power to determine all questions concerning the ownership and disposition of the property. *Murtha*, 232 So.2d at 55.

The Divorce Court dismissed the Receiver based on its belief that the Receiver was no longer necessary to complete the Purchase Agreement.[9] The transcript from

___

9. At the February 15, 2006, hearing the Divorce Court stated, "I understand [purchaser wants the] sale to happen and so forth, but I don't think [discharge of the receiver] ex-

the hearing in the Divorce Court on February 15, 2005, indicates that the Divorce Court was satisfied that the Purchase Agreement could, should, and would be concluded between the Purchaser and the Elizabeth, in the Receiver's stead, just as efficiently as between the Purchaser and the Receiver.

Elizabeth cites a variety of cases which stand generally for the proposition that the owner of a business or property does not assume liability for a tort which occurs during a receiver's operation of that business or property. This Court finds no fault with that proposition, but does not find those cases helpful to an analysis of the situation before the Court. At bottom, Elizabeth's argument to invalidate the sale rests on this Court assuming a narrow interpretation of the role of the Receiver in this case. Such an interpretation would contradict the clear intent of the Divorce Court.

The sale was approved by the Divorce Court under procedures which Elizabeth unsuccessfully challenged on appeal to the Fourth District Court of Appeal. As noted above, Elizabeth did not appeal from the Divorce Court's order approving the sale. Elizabeth's sole substantive basis for arguing that the Purchase Agreement cannot be assumed by the Trustee is that the Divorce Court dismissed the Receiver before the Purchase Agreement was consummated. Elizabeth's arguments on this point are unconvincing. The Divorce Court fully intended that the Hotel be sold under the Purchase Agreement, and fully intended that the Purchase Agreement survive the discharge of the Receiver.

This Court will not second guess the Divorce Court's intent and will not rule as a matter of law that the discharge of a receiver necessarily voids all contracts entered into by that receiver.

## C. Elizabeth's argument that the deadline for the Trustee to assume the Purchase Contract has expired is unavailing

■ The deadline for the assumption of executory contracts in Chapter 7 cases is fixed by 11 U.S.C. § 365(d)(1) as "60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes." The Trustee dutifully filed a series of timely motions seeking extensions of that deadline, each of which was timely granted by this Court.[10] The last such Order was entered December 19, 2005 (CP 72) and provided in relevant part:

1. The motion is granted.

2. The trustee has an additional 45 days, under January 24, 2006, to assume or reject the contract with José Saal to sell the Sheldon Beach Hotel, located in Hollywood, Florida.

3. No further extensions of the deadline to assume or reject will be granted without the prior approval of Mr. Saal, through counsel.

January 24th came and went without the filing of an additional motion by the Trustee seeking a further extension of the deadline. Rather, on March 17, 2006, the Trustee filed the Trustee's Verified Motion for Retroactive Extension of Deadline Set by Court's Order Granting Trustee's Third Motion for Extension of Deadline to As-

---

cludes that possibility at all." Exh. K to Saal's Motion pg. 23, l. 2–4. Additionally, the Divorce Court stated, "I'm not sure that the appellate opinion [affirming the sale] is contingent on who the seller is." *Id.* at pg. 25, l. 8–12.

10. Acting through Bankruptcy Judge Paul G. Hyman, Jr., to whom this case was assigned until it was transferred effective February 21, 2006 (CP 103) to the undersigned newly-appointed bankruptcy judge.

sume or Reject Executory Contract (the "Trustee's Retroactive Motion").

The thrust of the Trustee's Retroactive Motion is that this Court should retroactively extend the deadline for her to assume the Purchase Agreement under the excusable neglect standard of Bankruptcy Rule 9006(b)(1). In the Trustee's Retroactive Motion, the Trustee contends that the December 19, 2005 order (CP 72) was not served on the Trustee or her counsel, Patrick Scott, and that neither the Trustee nor the law firm of Scott Malnik & Salkin had seen a copy until Mr. Scott saw it on the computer screen in the courtroom on March 15, 2006. Furthermore, the Trustee contends that Mr. Saal and the Trustee, both acting through counsel, have continually agreed that the deadline would be extended each time a deadline approached, and specifically agreed in January that the time to assume or reject would remain open. Finally, the Trustee argues that no one is prejudiced by extending the deadline. (The Trustee's Retroactive Motion ¶ 2,3).

The Trustee cites *Pioneer Investment Services Co. v. Brunswick Associates LP*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) for the proposition that under Fed.R.Bankr.P. ("Rule") 9006(b)(1), the following "non-exhaustive" factors help determine whether excusable neglect exists:

(1) Whether granting the delay will prejudice the debtor; (2) the length of the delay and its impact on efficient court administration; (3) whether delay was beyond the reasonable control of the person whose duty it was to perform; (4) whether the creditor acted in good faith; and (5) whether clients should be penalized for their counsel's mistake or

neglect. *Pioneer Investment Services Co.,* 507 U.S. at 385, 113 S.Ct. 1489. The Trustee argues that the excusable neglect standard under Rule 9006(b)(1) applies because no one has been prejudiced by the open extension, and the Purchaser has consistently agreed to extension of the deadline and the to the assumption of the contract. The Purchaser most emphatically agrees.

Elizabeth does not. She argues that because the deadline for the Trustee to assume the Purchase Agreement has expired under 11 U.S.C. § 365, the contract has been rejected as a matter of law and that the excusable neglect standard of Rule 9006(b)(1) is inapplicable.[11] Elizabeth cites *In re Capellen,* 39 B.R. 40 (Bankr.S.D.Fla.1984) for the proposition that "[T]his court may not extend the 60 day period except upon application by the trustee made within that time. The obvious statutory purpose is to preclude this Court from retroactively extending the time for assumption upon a retroactive application by the trustee." *In re Capellen,* 39 B.R. at 40. Similarly, *In re Haute Cuisine, Inc.,* 57 B.R. 200, 203 (Bankr. M.D.Fla.1986) "preclude[s] this Court from retroactively extending the time for assumption upon a retroactive application by the trustee." *In re Haute Cuisine, Inc.,* 57 B.R. at 203.

█ *Capellen* and *Haute Cuisine* were cases dealing with the initial 60 day period prescribed by § 365(d)(1). Those cases hold that the court is powerless to modify the deadline in an *ex post facto* manner and that any extension of the § 365 deadline must be granted prior to its extension.[12] They were not cases in which the

---

**11.** Bankruptcy Rule 9006(b) refers to deadlines set "by these rules or by notice given thereunder or by order of the court." It does

not refer to enlarging time periods prescribed by statute.

**12.** Elizabeth also cites *In re ALBA Press, Inc.,* 55 B.R. 127 (Bankr.E.D.N.Y.1985) for the

court had already extended the deadline, thereby creating a time deadline established by order of court. Once the court has taken control of the § 365 deadline by extending it once or more, the new deadline is one governed by the general rules governing enlargement of time under Rule 9006(b)(1).

Bankruptcy courts are courts of equity. The excusable neglect standard of Rule 9006(b)(1) is part of the equitable framework within which the bankruptcy courts operate. Taking the Trustee's verified representations as to her and her counsel's unfamiliarity with the Court's December 19, 2005 Order extending the deadline for assumption of rejection at face, namely, that they were unaware of it until March 15, 2006, it is not clear that there was any "neglect" in the conventional sense in their failure to seek a further extension of the deadline before it expired on January 24, 2006. Nonetheless, the Court is satisfied by the totality of the circumstances that the Trustee's failure to seek a further extension of the deadline to assume or reject the Purchase Agreement constituted "excusable neglect" within the meaning of Rule 9006(b)(1) and *Pioneer*. Specifically, the Court finds that no party in interest has been prejudiced by the delay (Elizabeth's protests to the contrary notwithstanding); that the duration of the delay and its effects upon the orderly and efficient administration of this case are *de minimis*; that the delay was beyond the Trustee's control; that the Trustee and the Purchaser have each acted in good faith throughout; and that the Purchaser in particular should not be penalized by virtue of the delay. Because Rule 9006(b)(1) provides the applicable standards, Elizabeth's reliance on the cases

dealing with a trustee's failure to act within the initial 60 days after the order for relief are inapplicable, and their harsh result does not apply.

### Conclusion

The Purchase Agreement is a valid executory contract. The Divorce Court's dismissal of the Receiver did not invalidate or terminate the Purchase Agreement between Purchaser and the Receiver because the Divorce Court clearly and unambiguously intended that the Purchase Agreement survive the termination of the Receivership. As a result, the Purchase Agreement was valid and enforceable in accordance with its terms and was an executory contract on the date the Order for Relief was entered in this case on June 20, 2005. The Trustee timely sought and was granted extensions of the deadline to assume or reject the Purchase Agreement, and her failure to seek a timely extension of the January 24, 2006 deadline was the result of curable excusable neglect. The Trustee has provided adequate assurance that she can perform under the Purchase Agreement. The assumption of the Purchase Agreement is within the Trustee's sound business judgment, and the Court is satisfied that the assumption of the Purchase Agreement is in the best interests of the estate and its creditors.

Accordingly, it is ORDERED:

1. The Trustee's Motion to Assume Executory Contract for Sale of Real Property, and to Settle Dispute with José Saal ("365 Assumption Motion") (CP 113) is hereby GRANTED.

2. The Trustee's Verified Motion for Retroactive Extension of Deadline to As-

---

same general proposition. *ALBA* involved a non-residential real property lease whose assumption is governed by § 365(d)(4), which

by its terms limits the provisions of § 365(d)(1). *ALBA* is accordingly inapposite.

372

sume or Reject Executory Contract (CP 124) is hereby GRANTED.